# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

BROADCAST MUSIC, INC; PEER
INTERNATIONAL CORPORATION; CD
ELVIS PUBLISHING; SER-CA
PUBLISHING, INC.; LUAR MUSIC
CORP., d/b/a Luar Music Publishing;
SONGS OF UNIVISION, INC.;
FONOMUSIC, INC.; d/b/a Fonohits Music
Publishing, Inc.; UNIVERSAL-SONGS OF
POLYGRAM INTERNATIONAL, INC.;
EMOTIONAL WRENCH; and DOOR
NUMBER ONE MUSIC,
     Plaintiffs

VS.

TEX BORDER MANAGEMENT, INC.,
d/b/a Far West, and ALFREDO
HINOJOSA, Individually
     Defendant

CIVIL ACTION NO. 3:10-CV-02524

---

## DEFENDANTS' BRIEF IN SUPPORT OF ITS RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

John L. Gamboa
Texas State Bar No. 07606000

2501 Parkview Drive, Suite 405
Fort Worth, Texas 76102
(817)885-8500
(817)885-8504 Fax

Acuff & Gamboa, LLP
Attorney for Defendants

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................2

TABLE OF AUTHORITIES.............................................................................................3

OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT PROOF ....................................6
    **1.**    **Exhibit 1: Affidavit of Hope M. Lloyd**.......................................6
    **2.**    **Exhibit 2: Affidavit of Paul Knipler**......................................10
    **3.**    **Exhibit 3: Affidavit of Thomas R. Cushing**.........................13

PLAINTIFF NOT ENTITLED TO SUMMARY JUDGMENT.............................................17
    **A.**    **The Copyright Acts**..............................................................17
    **B.**    **Sound Recordings**................................................................19
    **C.**    **Copyright Formalities–Registration and Notice**...............23
    **D.**    **Proof of Infringement**..........................................................24
    **E.**    **(1) The Dynamics of Fair Use**..............................................26
    **E.**    **(2) Purpose and Character of the Use**...................................28
    **F.**    **Damages and Profits**............................................................30
    **G.**    **Injunctive Relief**..................................................................32

ARGUMENT AND AUTHORITIES...............................................................................33
    **A.**    **SUMMARY JUDGMENT: THE APPROPRIATE LEGAL STANDARD
              AND THE BURDEN OF PROOF.**.....................................33

CONCLUSION AND PRAYER......................................................................................36

CERTIFICATE OF SERVICE........................................................................................37

## TABLE OF AUTHORITIES

*Cooper-Shut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004)

*Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998)

*TIG Ins. Co. v. Sedwich James*, 276 F.3d 754, 759 (5th Cir. 2002)

*Clark v. Am. 's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997)

*Radio Station KSCS v. Jennings*, 750 SW2d 760, 762 (Tex. 1988)

*Fair Woman, Inc. v. Transland Management*, 766 SW2d 323 (Tex. App.–Dallas 1989, no writ)

*Jackson T. Fulingham Co. v. Stewart Title Guaranty Co.*, 649 SW2d 128, 130 (Tex. App.–Dallas 1983, writ ref'd n.r.e.)

*Connor v. Wright*, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ)

*Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App-Houston [1st Dist.] 1985, writ ref'd n.r.e)

*Sholdra v. Bluebonnet Sav. Bank, FSB*, 858 S.W.2d 533, 535 (Tex.App-Fort Worth 1993, writ denied)

*Knox v. Taylor*, 992 S.W.2d 40,64 (Tex.App-Houston [14 Dist.] 1999, no writ)

*Geiselman v. Cramer Financial Group, Inc.*, 965 S.W.2d 532, 538 (Tex.App.-Houston [14 Dist.],1997, no writ)

*White-Smith Music Publishing Co. v. Apollo Co.* (1908)

17 U.S.C.A. § 102(a)

17 U.S.C.A. § 114(b)

17 U.S.C.A. §§ 401(d), 402(d)

17 U.S.C.A. §§ 411, 412

*Ferguson v. National Broadcasting Co.* (1978)

*Bleistein v. Donaldson Lithographing Co.* (1903)

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.* (1977)

_Eisenschiml v. Fawcett Publications, Inc._ (1957)

_Greenbie v. Noble_ (1957)

_Sheldon v. Metro-Goldwyn Pictures Corp._ (1936)

_Arnstein v. Porter_ (1946)

_Nichols v. Universal Pictures Corp._ (1930).

_Sid & Marty Krafft Television Productions, Inc. v. McDonald's Corp._ (1977)

_Peter Pan Fabrics, Inc. v. Martin Weiner Corp._ (1960)

17 U.S.C.A. § 107.

_Harper & Row, Publishers, Inc. v. Nation Enterprises, Inc._ (1985)

_Sony Corp. of America v. Universal City Studios, Inc._ (1984)

_Dellar v. Samuel Goldwyn, Inc._ (1939).

_Williams & Wilkins v. United States_ (1973)

_Universal City Studios, Inc. v. Sony Corp. of America_ (1979)

_Campbell v. Acuff-Rose Music, Inc._ (1994)

_MacMillan v. King_ (1914)

_Encyclopaedia Britannica Educational Corp. v. Crooks_ (1978)

_Marcus v. Rowley_ (1983)

_Wainwright Securities, Inc. v. Wall Street Transcript Corp._ (1977).

_Thomas Wilson & Co. v. Irving J. Dorfman Co._ (1970)

_Sheldon v. Metro-Goldwyn Pictures Corp._ (1940)

_Shapiro, Bernstein & Co. v. 4636 South Vermont Ave., Inc._ (1966)

_Feltner v. Columbia Pictures Television, Inc._ (1998)

17 U.S.C.A. § 502(a).

_Florom v. Elliott Manufacturing_, 867 F.2d 570 (10th Cir.–1989)

_Sartor v. Arkansas Natural Gas Corporation_, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944)

_Sartor_, 321 U.S. at 628-629

_Agosto v. Immigration and Naturalization Service_, 436 U.S. 748, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978)

_Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

_Celotex Corporation v. Catrell_, 477 U.S. 317 (1986)

_Benton Volvo Metairie v. Volvo Southwest, Inc._, 479 F.2d 135 (5th Circuit - 1973)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| BROADCAST MUSIC, INC; PEER INTERNATIONAL CORPORATION; CD ELVIS PUBLISHING; SER-CA PUBLISHING, INC.; LUAR MUSIC CORP., d/b/a Luar Music Publishing; SONGS OF UNIVISION, INC.; FONOMUSIC, INC.; d/b/a Fonohits Music Publishing, Inc.; UNIVERSAL-SONGS OF POLYGRAM INTERNATIONAL, INC.; EMOTIONAL WRENCH; and DOOR NUMBER ONE MUSIC,<br>          Plaintiffs<br><br>VS.<br><br>TEX BORDER MANAGEMENT, INC., d/b/a Far West, and ALFREDO HINOJOSA, Individually<br>          Defendant | CIVIL ACTION NO. 3:10-CV-02524 |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND BRIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, TEX BORDER MANAGEMENT, INC., d/b/a Far West, and ALFREDO

HINOJOSA, Individually, Defendants herein, and files this Response to Plaintiff's Motion for

Summary Judgment. In support of this response, Defendants respectfully shows the Court the

following:

**I.**

**OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT PROOF**

Defendants specific objections to Plaintiff's evidence are as follows:

1.      **Exhibit 1: Affidavit of Hope M. Lloyd**

Affidavits must (1) show that the affiant is competent to testify, (2) be based on the affiant's personal knowledge, and (3) state admissible facts. Fed. R. Civ. P. 56(c)(4). A court must not consider parts of an affidavit that fail to meet the standards of [formerly numbered] Fed. R. Civ. P. 56(e) when considering a motion for summary judgment. *Cooper-Shut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). Bare allegations of fact, ultimate or conclusory facts, and legal conclusions are not sufficient summary judgment proof. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998); *TIG Ins. Co. v. Sedwich James*, 276 F.3d 754, 759 (5th Cir. 2002) (conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are no substitute for specific facts showing genuine issue of material fact). Dynasty asserts the following objections to the Affidavit of Hope M. Lloyd. *Clark v. Am. 's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.") and these statements are not based on personal knowledge as a condition precedent to admissibility under FED. R. EVID. 602.

A.    **The affidavit of Hope M. Lloyd fails in the following manner:**

Because the affidavit fails, the documents attached to it are inadmissable as hearsay.

The affidavit of Hope M. Lloyd is insufficient and defective as summary judgment proof. The affidavit fails to state how the affiant acquired personal knowledge of the few facts alleged, other than her statement that she is "an attorney employed by Plaintiff Broadcast Music, Inc. ("BMI")" and she "is familiar with the facts and circumstances in this matter as well as BMI's structure and operation." She does not state that she makes the affidavit based upon her review of those records or BMI's records. The affidavit is replete with legal conclusions, hearsay and short on admissible facts. It is also the affidavit of an interested witness. There purports to be attached several

documents, which are hearsay unless a proper exception to hearsay rule is adequately pled.

Defendants object to these statements as legal conclusions. *Clark vs. Am's Favorite Chicken Co.*, 110 F3d 295, 297 (5th Cir 1997)

A summary judgment affidavit must show how the affiant became personally familiar with all the facts to be able to testify as a witness. *Radio Station KSCS v. Jennings*, 750 SW2d 760, 762 (Tex. 1988); *Fair Woman, Inc. v. Transland Management*, 766 SW2d 323 (Tex. App.–Dallas 1989, no writ). Hope M. Lloyd 's affidavit states that she is "an attorney employed by Plaintiff Broadcast Music, Inc. ("BMI")"and she "is familiar with the facts and circumstances in this matter as well as BMI's structure and operation," not that she originally created the documents, nor does she state who did create the documents, only that she has personal knowledge of the facts stated in her affidavit, but it fails to state how she acquired that personal knowledge, nor who actually accomplished the actions stated and how. She further does not state that her affidavit is based upon her review of Plaintiff's records. She fails to state what her duties and responsibilities are as "an attorney employed by Plaintiff Broadcast Music, Inc. ("BMI")", and how this qualifies her to attempt the introduction of the hearsay statements and exhibits.  These are conclusory statements that fail to show who has actual knowledge of the completion of the events stated, not based on personal knowledge as a condition precedent to admissibility. Defendants object to these statements as inadmissible speculation and hearsay.

> An affidavit must affirmatively show how the affiant became personally familiar with the facts so as to be able to testify as a witness, and a self-serving recitation of such does not satisfy the requirement. *Jackson T. Fulingham Co. v. Stewart Title Guaranty Co.*, 649 SW2d 128, 130 (Tex. App.–Dallas 1983, writ ref'd n.r.e.).

Ms. Lloyd states in her affidavit that her employment for Plaintiff as "an attorney employed by Plaintiff Broadcast Music, Inc. ("BMI")" allows her to have access to and has reviewed Plaintiff's business records between Plaintiff and Defendant. The purposed records appear to be a schedule

without a verifying signature.

It is necessary for the custodian to have personal knowledge of the information contained in the record. *See* *Connor v. Wright*, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ);

*Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App-Houston [1st Dist.] 1985, writ ref'd n.r.e). Which state we agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). *See* *Sholdra v. Bluebonnet Sav. Bank, FSB*, 858 S.W.2d 533, 535 (Tex.App-Fort Worth 1993, writ denied).

*Knox v. Taylor*, 992 S.W.2d 40,64 (Tex.App-Houston [14 Dist.] 1999, no writ)

## II.

Consequently, the affidavit fails to state how Ms. Lloyd has any knowledge of these documents or how or by whom or when the documents were generated. Testimony of "an attorney employed by Plaintiff Broadcast Music, Inc. ("BMI")" is not sufficient to admit a parties records as business records without some evidence of reliability and that they were obtained from a person with knowledge.

Appellants argue it is not necessary for the custodian to have personal knowledge of the information contained in the record. *See* *Connor v. Wright*, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ); *Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). We agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). *See* *Sholdra v. Bluebonnet Sav. Bank, FSB*, 858 S.W.2d 533, 535 (Tex.App.-Fort Worth 1993, writ denied).

*Knox v. Taylor*, 992 S.W.2d 40, 64 (Tex.App.-Houston [14 Dist.],1999, no writ)

Ms. Lloyd's affidavit, further, does not state the attached documents are the original, true and correct copy nor an exact duplicate thereof of the Plaintiff which has been maintained by the Plaintiff.

> To be admissible in evidence as photocopies of the original notes, the Green affidavit must verify that the notes are true and correct copies of the originals from his own personal knowledge gained from sources other than the unverified records of its predecessors.

*Geiselman v. Cramer Financial Group, Inc.*, 965 S.W.2d 532, 538 (Tex.App.-Houston [14 Dist.],1997, no writ)

Fed. R. Evid. 106. Defendants object to these statements as assuming facts not in evidence and inadmissible speculation. *TIG Ins Co.*, 276 F3d 759

**III.**

**2.      Exhibit 2: Affidavit of Paul Knipler**

Affidavits must (1) show that the affiant is competent to testify, (2) be based on the affiant's personal knowledge, and (3) state admissible facts. Fed. R. Civ. P. 56(c)(4). A court must not consider parts of an affidavit that fail to meet the standards of [formerly numbered] Fed. R. Civ. P. 56(e) when considering a motion for summary judgment. *Cooper-Shut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). Bare allegations of fact, ultimate or conclusory facts, and legal conclusions are not sufficient summary judgment proof. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998); *TIG Ins. Co. v. Sedwich James*, 276 F.3d 754, 759 (5th Cir. 2002) (conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are no substitute for specific facts showing genuine issue of material fact). Dynasty asserts the following objections to the Affidavit of Paul Knipler. *Clark v. Am. 's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.") and these statements are not based on personal knowledge as a condition precedent to admissibility under FED. R. EVID. 602.

A.      **The affidavit of Paul Knipler fails in the following manner:**

Because the affidavit fails, the documents attached to it are inadmissable as hearsay.

The affidavit of Paul Knipler is insufficient and defective as summary judgment proof. The affidavit fails to state how the affiant acquired personal knowledge of the few facts alleged, other than his statement that he is "Senior Director, Business Affairs, for Plaintiff Broadcast Music, Inc. ("BMI")"and he "is fully familiar with the facts and circumstances in this matter as well as BMI's structure and operation." He does not state that he makes the affidavit based upon his review of those records or BMI's records. The affidavit is replete with legal conclusions, hearsay and short on admissible facts. It is also the affidavit of an interested witness. There purports to be attached several documents, which are hearsay unless a proper exception to hearsay rule is adequately pled.

Defendants object to these statements as legal conclusions. _Clark vs. Am's Favorite Chicken Co._, 110 F3d 295, 297 (5th Cir 1997)

A summary judgment affidavit must show how the affiant became personally familiar with all the facts to be able to testify as a witness. _Radio Station KSCS v. Jennings_, 750 SW2d 760, 762 (Tex. 1988); _Fair Woman, Inc. v. Transland Management_, 766 SW2d 323 (Tex. App.–Dallas 1989, no writ). Paul Knipler's affidavit states that he "Senior Director, Business Affairs, for Plaintiff Broadcast Music, Inc. ("BMI")"and he "is fully familiar with the facts and circumstances in this matter as well as BMI's structure and operation," not that he originally created the documents, nor does he state who did create the documents, only that he has personal knowledge of the facts stated in his affidavit, but it fails to state how he acquired that personal knowledge, nor who actually accomplished the actions stated and how. He further does not state that his affidavit is based upon his review of Plaintiff's records. He fails to state what his duties and responsibilities are as "Senior Director, Business Affairs, for Plaintiff Broadcast Music, Inc. ("BMI")", and how this qualifies him

to attempt the introduction of the hearsay statements and exhibits.  These are conclusory statements that fail to show who has actual knowledge of the completion of the events stated, not based on personal knowledge as a condition precedent to admissibility. Defendants object to these statements as inadmissible speculation and hearsay.

> An affidavit must affirmatively show how the affiant became personally familiar with the facts <u>so as to be able to testify as a witness</u>, and a self-serving recitation of such does not satisfy the requirement. *Jackson T. Fulingham Co. v. Stewart Title Guaranty Co.*, 649 SW2d 128, 130 (Tex. App.–Dallas 1983, writ ref'd n.r.e.).

Mr. Knipler states in his affidavit that his employment for Plaintiff as "Senior Director, Business Affairs, for Plaintiff Broadcast Music, Inc. ("BMI")" allows him to have access to and has reviewed Plaintiff's business records between Plaintiff and Defendant. The purposed records are unverified infringement reports and attached statements from other individuals different than affiant.

> It  is necessary for the custodian to have personal knowledge of the information contained in the record.  *See Connor v. Wright*, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ);

> *Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App-Houston [1st Dist.] 1985, writ ref'd n.r.e). Which state we agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information.  Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6).  *See Sholdra v. Bluebonnet Sav. Bank, FSB*, 858 S.W.2d 533, 535 (Tex.App-Fort Worth 1993, writ denied).

> *Knox v. Taylor*, 992 S.W.2d 40,64 (Tex.App-Houston [14 Dist.] 1999, no writ)

### IV.

Consequently, the affidavit fails to state how Mr. Knipler has any knowledge of these documents or how or by whom or when the documents were generated. Testimony of "Senior Director, Business Affairs, for Plaintiff Broadcast Music, Inc. ("BMI")" is not sufficient to admit a

parties records as business records without some evidence of reliability and that they were obtained from a person with knowledge.

> Appellants argue it is not necessary for the custodian to have personal knowledge of the information contained in the record. *See Connor v. Wright*, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ); *Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). We agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). *See Sholdra v. Bluebonnet Sav. Bank, FSB*, 858 S.W.2d 533, 535 (Tex.App.-Fort Worth 1993, writ denied).

> *Knox v. Taylor*, 992 S.W.2d 40, 64 (Tex.App.-Houston [14 Dist.],1999, no writ)

Mr. Knipler's affidavit, further, does not state the attached documents are the original, true and correct copy nor an exact duplicate thereof of the Plaintiff which has been maintained by the Plaintiff.

> To be admissible in evidence as photocopies of the original notes, the Green affidavit must verify that the notes are true and correct copies of the originals from his own personal knowledge gained from sources other than the unverified records of its predecessors.

*Geiselman v. Cramer Financial Group, Inc.*, 965 S.W.2d 532, 538 (Tex.App.-Houston [14 Dist.],1997, no writ)

Fed. R. Evid. 106. Defendants object to these statements as assuming facts not in evidence and inadmissible speculation. *TIG Ins Co.*, 276 F3d 759

**V.**

3.    **Exhibit 3: Affidavit of Thomas R. Cushing**

Affidavits must (1) show that the affiant is competent to testify, (2) be based on the affiant's personal knowledge, and (3) state admissible facts. Fed. R. Civ. P. 56(c)(4). A court must not

consider parts of an affidavit that fail to meet the standards of [formerly numbered] Fed. R. Civ. P. 56(e) when considering a motion for summary judgment. *Cooper-Shut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). Bare allegations of fact, ultimate or conclusory facts, and legal conclusions are not sufficient summary judgment proof. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998); *TIG Ins. Co. v. Sedwich James*, 276 F.3d 754, 759 (5th Cir. 2002) (conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are no substitute for specific facts showing genuine issue of material fact). Dynasty asserts the following objections to the Affidavit of Thomas R. Cushing. *Clark v. Am. 's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.") and these statements are not based on personal knowledge as a condition precedent to admissibility under FED. R. EVID. 602.

### A.   The affidavit of Thomas R. Cushing fails in the following manner:

Because the affidavit fails, the documents attached to it are inadmissable as hearsay.

The affidavit of Thomas R. Cushing is insufficient and defective as summary judgment proof. The affidavit fails to state how the affiant acquired personal knowledge of the few facts alleged, other than his statement that he is "an attorney for Plaintiff Broadcast Music, Inc. ("BMI")"and he "has personal knowledge of every statement made herein" He does not state that he makes the affidavit based upon his review of those records or BMI's records. The affidavit is replete with legal conclusions, hearsay and short on admissible facts. It is also the affidavit of an interested witness. There purports to be attached several documents, which are hearsay unless a proper exception to hearsay rule is adequately pled.

Defendants object to these statements as legal conclusions. *Clark vs. Am's Favorite Chicken*

_Co._, 110 F3d 295, 297 (5th Cir 1997)

A summary judgment affidavit must show how the affiant became personally familiar with all the facts to be able to testify as a witness. _Radio Station KSCS v. Jennings_, 750 SW2d 760, 762 (Tex. 1988); _Fair Woman, Inc. v. Transland Management_, 766 SW2d 323 (Tex. App.–Dallas 1989, no writ). Thomas R. Cushing's affidavit states that he is "an attorney for Plaintiff Broadcast Music, Inc. ("BMI")"and he "has personal knowledge of every statement made herein" not that he originally created the documents, nor does he state who did create the documents, only that he has personal knowledge of the facts stated in his affidavit, but it fails to state how he acquired that personal knowledge, nor who actually accomplished the actions stated and how. He further does not state that his affidavit is based upon his review of Plaintiff's records. He fails to state what his duties and responsibilities are as "an attorney for Plaintiff Broadcast Music, Inc. ("BMI")", and how this qualifies him to attempt the introduction of the hearsay statements and exhibits.  These are conclusory statements that fail to show who has actual knowledge of the completion of the events stated, not based on personal knowledge as a condition precedent to admissibility. Defendants object to these statements as inadmissible speculation and hearsay.

An affidavit must affirmatively show how the affiant became personally familiar with the facts so as to be able to testify as a witness, and a self-serving recitation of such does not satisfy the requirement. _Jackson T. Fulingham Co. v. Stewart Title Guaranty Co._, 649 SW2d 128, 130 (Tex. App.–Dallas 1983, writ ref'd n.r.e.).

Mr. Cushing states in his affidavit that his employment for Plaintiff as "an attorney for Plaintiff Broadcast Music, Inc. ("BMI")" allows him to have access to and has reviewed Plaintiff's business records between Plaintiff and Defendant. The purposed records are admissions and denials allegedly by Defendants which create a fact issue for the trier of fact.

It  is necessary for the custodian to have personal knowledge of the information contained in the record.  _See Connor v. Wright_, 737 S.W.2d 42, 44-45 (Tex.App.-San

Antonio 1987, no writ);

_Clark v. Walker-Kurth Lumber Co._, 689 S.W.2d 275, 281 (Tex.App-Houston [1[st] Dist.] 1985, writ ref'd n.r.e). Which state we agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). _See Sholdra v. Bluebonnet Sav. Bank, FSB_, 858 S.W.2d 533, 535 (Tex.App-Fort Worth 1993, writ denied).

_Knox v. Taylor_, 992 S.W.2d 40,64 (Tex.App-Houston [14 Dist.] 1999, no writ)

## VI.

Consequently, the affidavit fails to state how Mr. Cushing has any knowledge of these documents or how or by whom or when the documents were generated. Testimony of "an attorney for Plaintiff Broadcast Music, Inc. ("BMI")" is not sufficient to admit a parties records as business records without some evidence of reliability and that they were obtained from a person with knowledge.

Appellants argue it is not necessary for the custodian to have personal knowledge of the information contained in the record. _See Connor v. Wright_, 737 S.W.2d 42, 44-45 (Tex.App.-San Antonio 1987, no writ); _Clark v. Walker-Kurth Lumber Co._, 689 S.W.2d 275, 281 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). We agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). _See Sholdra v. Bluebonnet Sav. Bank, FSB_, 858 S.W.2d 533, 535 (Tex.App.-Fort Worth 1993, writ denied).

_Knox v. Taylor_, 992 S.W.2d 40, 64 (Tex.App.-Houston [14 Dist.],1999, no writ)

Mr. Cushing's affidavit, further, does not state the attached documents are the original, true and correct copy nor an exact duplicate thereof of the Plaintiff which has been maintained by the Plaintiff.

> To be admissible in evidence as photocopies of the original notes, the Green affidavit must verify that the notes are true and correct copies of the originals from his own personal knowledge gained from sources other than the unverified records of its predecessors.

*Geiselman v. Cramer Financial Group, Inc.*, 965 S.W.2d 532, 538 (Tex.App.-Houston [14 Dist.],1997, no writ)

Fed. R. Evid. 106. Defendants object to these statements as assuming facts not in evidence and inadmissible speculation. *TIG Ins Co.*, 276 F3d 759

**VII.**

**PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT**

A.     **The Copyright Acts**

Pursuant to the constitutional clause, Congress adopted a copyright statute in 1790 and, since that time, has substantially revised or rewritten the copyright law four times–in 1831, 1870, 1909, and 1976. More limited amendments, typically to deal with specific issues, have been enacted from time to time. As new forms of expression became commercially important, the copyright law was revised or rewritten to protect the exploitation of those technologies. In 1802 Congress added prints to the works subject to protection. The 1831 law added musical compositions to protected subject matter and the 1870 revision added such things as paintings, sculpture, and other fine arts to the list of copyrightable works.

The 1909 Act is primarily important today because it is the last act that maintained the distinctions between prepublication and postpublication rights. Although the 1976 Act abandoned that distinction, the 1909 dichotomy is still significant with respect to the immense body of protected works that originally were governed by the 1909 statute and in certain respects continue to be despite

the 1976 revisions. See § 24.7, infra.

All of the Acts have required deposit or registration of the protected work in one form or another either with a United States District Court, the Secretary of State, or, as is presently the case, the Register of Copyrights. At one time deposit was a prerequisite to protection but by 1909 deposit was merely a formality and became mandatory only to initiate an infringement suit. Registration has experienced a similar decline in significance.

Thus, the history of copyright protection is in many respects a history of decreasing formalities. Just as deposit and registration acheived lesser importance until they finally became merely formal prerequisites to the initiation of a lawsuit, so did virtually all other formalities.

Perhaps most importantly, the United States' accession to the Berne Convention in 1989 was accompanied by extraordinary revisions of the Act that essentially made copyright notice completely elective. Virtually its only significance now is that it bars a defense of innocent infringement. But because we are now a member of the Berne Convention, United States authors have gained more rights and advantages in the international copyright arena.

Until recently, the United States always had granted protection in multiples of fourteen years. The 1909 Act had an initial terms of twenty-eight years followed by a possible renewal for another twenty-eight years. The 1976 Act, however, adopted a lifetime-plus-fifty-years (now a lifetime-plus-seventy-years) period.

The present Act extends protection to just about anything that can be expressed in tangible form. Some works receive less protection than others–most notably sound recordings, which lack what are called "performance rights," except for digital transmissions thereof.

**B.**   **Sound Recordings**

Although music and sheet music have long been copyrightable subject matter, recordings of music have had a long history of doubtful copyright status. Three different categories of parties have an interest in the copyrightability of sound recordings. Composers obviously have an interest in profiting from the fruits of their labor. Equally interested are those persons and institutions that produce the recordings. The third are the performers. Each of these categories of parties has a different interest, although their positions sometimes may merge; each of these categories also has different legal protection.

Until just shortly before the enactment of the new Act, in 1972, when the 1909 Act was amended to provide increased protection, producers and performers had no copyright in the sound recording. This was primarily because of an early Supreme Court decision, _White-Smith Music Publishing Co. v. Apollo Co._ (1908), which held that piano rolls were not copies of the underlying musical composition they caused a player piano to reproduce, because piano rolls could not be read or deciphered by the naked eye. _White-Smith_ was extended to sound recordings. Thus, from 1908 until shortly before the 1976 Act, sound recordings had no copyright protection and could be reproduced by "pirates" with relative immunity from federal copyright laws.

However, the 1909 copyright revision gave some protection to the composers of underlying musical works in order to vitiate part of the harshness of _White-Smith_. Although not going so far as to reject _White-Smith_ by declaring sound recordings or piano rolls to be copies and thus subject to complete regulation by the copyright law, the 1909 legislation gave composers the exclusive right to authorize a sound recording. Once having authorized a sound recording, however, the composer was subject to a statutory license and royalty. Any other producer was free to manufacture his own

sound recordings upon payment of the statutory fee-which was two cents per copy. Congress adopted this compromise position between *White-Smith* and full copyrightability because of fears that if full copyright protection were granted, the producer of piano rolls, a company that effectively monopolized the recording market at the time, would dominate the market. Thus the compulsory license was seen as an ameliorative device while the composer's right to determine initial production was seen as granting the composer what was just.

Because of the compromise nature of the congressional response to *White-Smith*, there was a gap between the composer's right to a per-record royalty and the undefined positions of the publisher of the records and the performers. Since these devices could not be copyrighted, others were free to record their own versions of them subject only to the obligation to pay the statutory fee to the composer for the underlying musical composition. Eventually, record piracy became a serious problem. Rival manufacturers would simply obtain masters or copies of the authorized producer's phonorecords and proceed to reproduce and sell pirated copies, merely paying the small statutory royalty to the composer of the underlying musical composition or paying nothing to anyone. The performers and producers had no copyright that was infringed; likewise, the composer only had the right to the statutory royalty and, upon payment, had few other remedies. The manufacturer, of course, had no copyright at all, since his product was not a copyrightable work.

Recognizing this untenable situation, Congress finally granted record companies a copyright in their phonorecords in 1972 and empowered them to bring infringement actions against pirates. (Emphasis added) Under the 1976 Act, sound recordings and phonorecords are not treated differently from other mediums of expression with respect to being copyrightable subject matter. 17 U.S.C.A. § 102(a). Since a phonorecord is a fixation in tangible form of the underlying musical composition,

composers have copyright protection under the current Act with respect to sound recordings and phonorecords. Since phonorecords also are granted copyright protection as independent works, producers likewise have some, although severely limited, copyright protection.

The 1976 Act makes it clear that the old method of piracy that effectively immunized a pirate upon the payment of the compulsory fee no longer would defeat the composer's or the producer's rights. Under section 115(a)(1), a producer cannot duplicate (meaning the making of a literal and slavish copy of the electronic signals of) another's sound recording without the express consent of the owner of the copyright in the sound recording. Nevertheless, sound recordings still suffer from severely limiting provisions that restrict the rights that their owners have as compared to other copyright proprietors.

The most important limitation upon sound recordings aside from the existence of the compulsory license of the composer's work is the limitation upon exclusive rights. Owners of copyright in sound recordings have only the right to prevent literal copies. Whereas most copyright owners have all of the applicable rights listed in section 106, owners of copyrights in sound recordings-meaning basically producers of sound recordings-do not have, for instance, the right to exclude others from performing the work (the recording) publicly. This means that once a sound recording is produced, purchasers are free to perform the recording publicly (such as radio broadcasts) without paying the producer or performers any fee (although the composer of the underlying work has full rights over such performances). Additionally, the other exclusive rights listed in section 106 are also eliminated by section 114. The rights to exclude others from reproducing the work or from preparing derivative works are limited in the case of sound recordings to the production of literal copies. Thus, the owner of a sound recording can prevent others, for

instance "pirates," from actually reproducing a particular phonorecord or from preparing a derivative work by using the actual sounds of its recording in a rearrangement or other derivation using the actual sounds of the phonorecord. But the copyright owner cannot prevent others from simulating his recording or derivations "even though such sounds imitate or simulate those in the copyrighted sound recording." 17 U.S.C.A. § 114(b).

In terms of the current Act, it is important to distinguish between two components of a typically recorded work. First, the underlying musical composition is a separately copyrightable work of authorship, unaffected by the various perambulations of the Act under section 114 unless and until the composer authorizes the use of the composition in the production of a sound recording. Then, his control is diminished significantly (although just with respect to his inability to prevent others from making recordings pf the composition) by virtue of the compulsory license. Second, the sound recording is another separately copyrightable work of authorship, being the sounds that are fixed by the process of recording. If the sound recording makes use of a composition, it may be a work of more than one author-that of the underlying composer, the producer, and, perhaps of the performers. If the sound recording fixes other, nonmusical, sounds such as bird songs, automobile races, or ocean waves, for instance, its author most likely would be just the producer of the recording. In such a case, no underlying composition would be involved. The phonorecord is .simply the tangible medium in which the sound recording is expressed, the author of which, despite the possibility that it may embody an underlying musical composition or other work, is solely the manufacturer .who created the physical object and who has the right to prevent others from duplicating it-a right absent under previous laws at least until the 1972 amendments.

Thus, a phonorecord may embrace two separate copyrightable works of music-the sound

recording embodied in the phonorecord the producer of which is the person or persons who recorded the sounds, and the musical composition if the phonorecord is a recording of such a composition.

## C.     Copyright Formalities–Registration and Notice

Since the United States' accession to the Berne Convention in 1989, the copyright formalities, especially with respect to works published or distributed after accession, have lost almost all their legal significance, which already had been reduced by the 1976 Act. Now, notice of copyright, whatever its practical value may be, has virtually no legal significance. Its only legal effect is that including a notice on the copyrighted work can prevent an infringer, except for some kinds of fair users, from pleading innocent infringement. 17 U.S.C.A. §§ 401(d), 402(d). Even without notice, of course, the burden of proving innocent infringement still would be on the accused infringer. That is, the absence of notice does not make resulting infringements automatically innocent. Similarly, registration has almost no legal significance. There is only one somewhat substantive effect of registration in that attorneys' fees and statutory damages are only recoverable for postregistration infringements. The only remaining procedural effect of registration is that United States authors must register before bringing suit. 17 U.S.C.A. §§ 411, 412. These are all fact issues for the trier of fact.

With respect to older works under the 1976 Act that were published or distributed prior to United States accession to the Berne Convention, notice still has some importance, and those works are treated as they were before the Berne amendments to the Copyright Act. Basically, with respect to those works, copyright can be lost if notice was omitted and that omission was not cured within five years of publication, by registration and affixation of the notice to the remaining copies. 17 U.S.C.A. § 405. In the present case, there are no notations on the alleged musical arrangement as to date of recording or notice which is a fact question for the trier of fact.

D.     **Proof of Infringement**

To prove infringement, a party must establish ownership of the copyright and impermissible copying. In the present case the Plaintiff is not the owner of the copyright material. *Ferguson v. National Broadcasting Co.* (1978). If it can be shown that the defendant actually copied protected portions of the original work, infringement is easily demonstrated. However, since direct evidence of plagiarism seldom is available, infringement usually is proven through circumstantial evidence. Infringement is commonly proven by demonstrating that the allegedly infringing work bears a remarkable resemblance to the original and that the alleged infringer had some opportunity for contact with the original prior to creating the alleged infringement. The combination of remarkable similarity and opportunity for contact with the original is persuasive evidence that the infringer must have copied the original. In other words, infringement is established by proof of *access* and *substantial similarity*. *Ferguson v. National Broadcasting Co.*, supra. Of course, those elements merely constitute another way of describing the requisite circumstantial evidence to justify an inference that copying actually occurred. In the present case, Plaintiff is not the owner of the copyright but alleges and arrangement with the true owner without proving such.

When the alleged infringement is a word-forword- or literal-copy, this is highly persuasive proof of copying and the requisite proof of access will be concomitantly lower. Alternatively, the more variation there is between the original and the alleged infringement, the more persuasive must be the proof that the defendant actually made use of the access that was available. As the variations become more significant and substantial, proof of access must be more than the mere opportunity for access. It will have to be actual exercise of that access-in other words, proof of actual copying.

However, proof of access and substantial similarity does not involve a discrete *substantive* doctrine. It is merely an *evidentiary* method-a restatement of the circumstantial evidence needed to establish infringement, which means that illegitimate copying has occurred. In addition, of course, substantial similarity must relate to the copyrightable substance of the original, and not elements of the original that constitute uncopyrightable ideas or matters in the public domain. *Bleistein v. Donaldson Lithographing Co.* (1903) ("Others are free to copy the original. They are not free to copy the copy.").

Infringement usually is shown m a two-stage process. The first is designed to reveal whether copying occurred. The second is designed to decide whether that copying, if any, amounts to impermissible appropriation. With respect to the first, analytical, or dissection, stage, the defendant's evidence often will include an examination of related works in the public domain. The evidence is probative of at least two conclusions: first, that the defendant borrowed from the public domain instead of the plaintiffs work; second, that the plaintiff himself borrowed from the public domain and therefore is not entitled to copyright protection. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.* (1977). Sometimes public domain material is relevant to prove that the defendant copied from plaintiff because of remarkable coincidences between the defendant's and the plaintiffs work in light of much greater variation between works already in the public domain and the plaintiffs work. See *Eisenschiml v. Fawcett Publications, Inc.* (1957); *Greenbie v. Noble* (1957).

Evidence concerning the content of the public domain is less relevant to the copyrightability of the plaintiffs work than it is to a conclusion of copying. It is relevant, that is, "so far as it may break the force of the inference to be drawn from likenesses between the work and the putative piracy." *Sheldon v. Metro-Goldwyn Pictures Corp.* (1936).

The second stage leads to the conclusion of infringement. Now, plaintiff must prove that, of the elements "copied" or "taken" from the original, at least some of them were those protected by copyright. Thus, there is a distinction between permissible copying and illicit copying or <u>unlawful appropriation</u>. (Emphasis added)   *Arnstein v. Porter* (1946). The issue of illicit as opposed to permissible copying is a matter for the lay observer and not for expert witnesses nor for piece-by-piece analysis of the elements of the two works. Permissible copying includes the taking of ideas; illicit copying appropriates protected expression. *Nichols v. Universal Pictures Corp.* (1930). See also *Sid & Marty Krafft Television Productions, Inc. v. McDonald's Corp.* (1977). The "lay observer" test or "ordinary observer" test is the key to drawing this distinction. The ordinary observer is similar to the reasonable person standard and is meant to distinguish between those similarities in two works an observer would notice and those the ordinary observer would tend to disregard as immaterial and

unrelated to the overall character of the two works. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.* (1960).

**E.**      <u>**(1) The Dynamics of Fair Use**</u>

Fair use involves a balancing process by which a complex of variables determine whether other interests should override the rights of creators. The current Act explicitly identifies four interests: (1) the purpose and character of the use, including its commercial nature; (2) the nature of the copyrighted work; (3) the proportion that was "taken"; and ( 4) the economic impact of the "taking." 17 U.S.C.A. § 107.

There are at least two additional interests relevant to fair use. First, although infringement

need not be intentional and although the intent of the defendant is not determinative, the intent and motives of the defendant often are relevant. Which is a fact issue for the trier of fact.  Second, a First Amendment interest often opposes the copyright monopoly. However, in *Harper & Row, Publishers, Inc. v. Nation Enterprises, Inc.* (1985), the Supreme Court found no inherent conflict between copyright law and the First Amendment, especially because of the very existence of the fair use defense. In *Harper & Row*, the Nation magazine had published excerpts from the memoirs of former President Ford before they were to be published in Time magazine, which then abandoned its plans to publish them. Minimizing First Amendment concerns, the Court held that the idea-expression dichotomy would have allowed the Nation to report the important facts of the memoir without "scooping" its very language and that, furthermore, there was no expansion of fair use based on a claimed "public figure" exception to copyright. The Court also emphasized the fact that the work had not yet had its "first publication," the significance of which apparently continues, even after the near-total replacement of common law copyright by statutory copyright through the 1976 Act, even though not as a prerequisite to protection as it had been under common law copyright, but as a fair use factor because of its arguably obvious economic impact.

In any case involving fair use at least one and usually more of these six interests are weighed against the interest in protecting the author's exclusive rights. To the extent that the user is not interested in profit but instead is using the work for educational purposes or for a completely private use, the demand that he be free of the copyright monopoly is more persuasive than it would be if he were profiting from his use. See *Sony Corp. of America v. Universal City Studios, Inc.* (1984). In *Sony*, a case complicated by the fact that the defendant was being sued not for direct infringement

but for "contributory infringement" by selling its VCRs to purchasers who were videotaping television programs at home, the Supreme Court found hometaping to be fair use. The Court emphasized the fact that there was no demonstrated injury to the plaintiffs, owners of films and television programs, that were, after all, broadcast free to viewers. In that circumstance, said the Court, the private practice of home-taping came well within the limits of fair use.

Thus, the dynamics of the fair-use doctrine involve weighing the various, and typically competing, interests. These interests have ambiguous boundaries, cannot be measured with any precision, and overlap with one another. It should be no surprise, therefore, that fair use has been termed "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.* (1939).

### E.    (2) Purpose and Character of the Use

Included in the notions of purpose and character are the dual concepts of commercial versus noncommercial and public versus private uses. Because the dynamics of fair use involve interrelated rather than determinative factors, however, there is certainly no doctrine mandating that mere noncommercial purpose nor mere private use are automatically fair uses. Nevertheless, as decisions of the Supreme Court make clear, the noncommercial nature of a use as well as its private character is highly persuasive. *Williams & Wilkins v. United States* (1973); *Sony Corp. of America v. Universal City Studios, Inc.* (1984).

Much more explicit in recognizing a "private" fair-use doctrine was the trial court in *Universal City Studios, Inc. v. Sony Corp. of America* (1979), the famous "Betamax" case, in which the Supreme Court held that the private nature of a use contributes to a finding of fair use. The Ninth Circuit held, however, that privacy concerns are not legitimate components of fair use and are more

appropriately addressed in the relief stage of copyright infringement litigation. Although some cases indicate that the explicitly commercial nature of a claimed fair use is highly and perhaps even presumptively important, the Supreme Court has held that this is only one factor, and that it establishes no presumption. _Campbell v. Acuff-Rose Music, Inc._ (1994).

Just as commercial purpose has been a basis for deciding against fair use, an educational purpose, especially a nonprofit one, has been a traditional basis in favor of fair use. Although the statute joins the terms nonprofit and educational, it is not at all clear that an educational fair use also must be nonprofit. The congressional history of the 1976 Act indicates that the legislative intent was to codify existing fair-use law. Prior case law does not require that an educational fair use also be a completely noncommercial one. At the same time, it should not be surprising that even when educational and nonprofit purposes coincide, fair use does not necessarily result. In _MacMillan v. King_ (1914), the court rejected the fair-use defense when a teacher copied substantial portions of an economics text for use by his students. The nature of the work-a text whose market was only expected to be in the educational area-and the substantiality of the copying far outweighed the educational and nonprofit purposes of the defendant.

Likewise, in _Encyclopaedia Britannica Educational Corp. v. Crooks_ (1978), the conjunction of an educational and a nonprofit purpose was insufficient to establish the fair-use defense even though the defendant was an exclusively educational governmental corporation and the duplicating of educational materials was intended merely to provide underprivileged citizens with educational assistance. The defense was rejected because the copying was total and because the only market for the educational copyrighted works was precisely the context in which the copying was done--education. However, _Williams & Wilkins v. United States_ (1973), supra, held that the educational purpose of the defendants' activities-massive copying and distributing of medical

journals--coupled with its completely nonprofit character was enough to outweigh the interest of the copyright holder and establish a fair-use defense. *Williams & Wilkins* has been seriously criticized and despite the statutory language of section 107, which parallels parts of the court's opinion, the fact that the case stands in relative isolation, perhaps uniquely based upon a public policy of advancing medical science, should serve as a warning that nonprofit educational uses will not automatically establish a fair-use defense. See *Marcus v. Rowley* (1983).

To sum up, perhaps the most accurate way of highlighting the "purpose and character" test is to note that the profit motive almost inevitably vitiates a claim of fair use and what is claimed to be educational, critical, or otherwise legitimate, is likely, when done for money, to be seen by a court as "chiselling  for personal profit." *Wainwright Securities, Inc. v. Wall Street Transcript Corp.* (1977).

## F.    Damages and Profits

Monetary awards in copyright infringement actions are categorized under three headings: damages, profits, and statutory damages. Under the 1909 Act, a plaintiff was entitled to damages "as well as" profits, leading some courts to interpret this as meaning that a plaintiff could recover both. In *Thomas Wilson & Co. v. Irving J. Dorfman Co.* (1970), the plaintiff recovered his own actual damages (lost profits) and also recovered all of the profits received by the defendant. The present Act clearly is designed to avoid that duplication of damages. Under section 504(a), a plaintiff is entitled to actual damages plus profits that are "additional" to those damages. Section 504(b) makes it clear that profits should be added to actual damages only if they were "not taken into account in computing the actual damages."

Thus, a plaintiff should attempt to prove both actual damages and profits. If plaintiff has

difficulty establishing actual damages or any part of them, then to the extent profits have been demonstrated that do not overlap, the plaintiff has a greater chance of recovering a larger and more appropriate award. The 1976 Act makes the plaintiff's task easier by providing that plaintiff need only establish gross profits (similar to the scheme under the Lanham Act, see § 18.2, supra). The defendant has the burden of establishing expenses to reduce gross profit to a net amount.

Another element of damages upon which the defendant has the burden of proof is apportionment of profits. Under section 405(b), if the defendant claims that many of the profits were not due to the infringement but, instead, were due to its own creation, or to public domain material, or in any case, to elements not owned by the plaintiff, defendant must somehow establish how much of the profits are attributable to elements not owned by the plaintiff. In _Sheldon v. Metro-Goldwyn Pictures Corp._ (1940), it was found that defendants had infringed the plaintiffs play when they produced a motion picture partly based on the play and an award of profits was made to the plaintiff. However, the total profits were reduced by eighty per cent because the court also found that only twenty per cent of the profits could be attributed to the plaintiffs creation. The majority of profits were attributable to the fact that a number of famous stars were in the movie, and further reduction was due to the fact that the story itself consisted largely of a plot that was in the public domain. This approach clearly is contemplated under the current Act, but the burden is expressly upon the defendant to reduce gross profits to a smaller net amount.

The third category of monetary awards is statutory damages, which may be elected by the plaintiff anytime prior to final judgment. Under the 1909 Act, statutory damages were "in lieu" damages, which the court, not the plaintiff, had discretion to choose. This discretion led to abuse when courts interpreted "in lieu" to mean that statutory damages could be awarded only if no actual damages could be demonstrated. Thus, in _Shapiro, Bernstein & Co. v. 4636 South Vermont Ave., Inc._

(1966), the court found that profits and damages had been established to be *de minimus* and that, there being no need to grant a statutory award "in lieu" of something already established, plaintiff should take nothing.

Under the 1976 Act, statutory damages are strictly within the plaintiff's discretion. Plaintiff has the right to a minimum of $750 and a maximum of $30,000, according to what the court finds "just." On the other hand, innocent infringers can prove their good faith and have the sum reduced to $200. At the same time, a court has the power to award as much as $150,000 if the infringement is found to be willful. That is, essentially, punitive damages. In certain cases involving a good faith belief that the defendant was exercising a fair use privilege, the court has the power to remit all damages. 17 U.S.C.A. § 504(c)(2). On the other hand, the unreasonable claim of fair use by an establishment providing TV or radio to its customers is subject to twice what the license fee would have been for the previous three years, in addition to any other damages. 17 U.S.C.A. § 504(d). Despite the language in the Act indicating that the court is to decide statutory damages, the Supreme Court determined in *Feltner v. Columbia Pictures Television, Inc.* (1998) that the Seventh Amendment consigns this task to the jury.

## G.    **Injunctive Relief**

The Copyright Act expressly provides for injunctive relief, to be fashioned in a way that is "reasonable to prevent or restrain infringement." 17 U.S.C.A. § 502(a). Although a blanket permanent injunction in fact may be the ultimate goal of a plaintiff, especially with respect to continual violations, a court has the power to fashion the relief in a reasonable way. This especially is applicable to the innocent infringer as well as to cases involving new technologies.

# VIII.

## ARGUMENT AND AUTHORITIES

### A.    SUMMARY JUDGMENT: THE APPROPRIATE LEGAL STANDARD AND THE BURDEN OF PROOF.

1.    The right to summary judgment was unknown to common law and exists in this State and the Federal District only by virtue of Rule 166-a of the Texas Rules of Civil Procedure, and Rule 56 of the Federal Rules of Civil Procedure. In order to be entitled to the benefits of the rule all of its terms must be complied with.

A defendant party who moves for summary judgment has the burden of clearly establishing his right thereto as a matter of law. See _Florom v. Elliott Manufacturing_, 867 F.2d 570 (10th Cir.–1989). By its nature summary judgment is likely to be ill suited for cases of a complex nature or to those that involve constitutional or other large public issues that often demand full exploration at trial. The present case, regarding zoning regulations and First Amendment questions, is such case.

In _Sartor v. Arkansas Natural Gas Corporation_, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944), a suit to recover royalties, the Supreme Court reversed a summary judgment for the defendant. In doing so the Court analogized summary judgment to a motion for directed verdict, noting that the defendant's affidavits had been given by interested or biased witnesses, the weight of whose testimony, if given at trial would have been for the jury to decide. The Court stated:

> It may well be that the weight of the evidence would be found on a trial to be with defendant. But it may not withdraw these witnesses from cross-examination, the best method yet devised for testing trustworthiness of testimony. And their credibility and the weight to be given their opinions is to be determined, after trial, in the regular manner.

*Sartor*, 321 U.S. at 628-629, see also *Agosto v. Immigration and Naturalization Service*, 436 U.S. 748, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978).

The Supreme Court's holding in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) illuminates the boundaries and constraints of summary judgment motions. *Anderson* was a media/public figure libel case wherein the defendants moved for a summary judgment. The Court of Appeals had held that the plaintiffs were not required to demonstrate, in the context of a summary judgment motion, that a jury could find actual malice with the "convincing clarity" that would be required for an ultimate favorable verdict. In the view of the appeals court, taking the required standard of proof at trial into account at the summary judgment level improperly transformed the summary judgment procedure into a waiver of the facts.

The Supreme Court reversed, focusing on the oft noted analogy of a motion for summary judgment to a Rule 50(a) motion for directed verdict. The Court pointed out that the standard of proof is necessarily taken into account when a court rules upon a motion for a directed verdict. The Court emphasized that its holding in *Anderson*:

> ... in a new line of demarcation by no means authorizes trial on affidavits. Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... The evidence of a non-movant is to be believed, and all justifiable references are to be drawn in his favor. [citing *Adickes v. S. H. Kress and Company*] Neither do we suggest that the trial court should act other than with caution in granting summary judgment.

*Id.*, 477 U.S. at 253, 106 S.Ct. at 2513.

Plaintiff [*Celotex Corporation v. Catrell*, 477 U.S. 317 (1986)] case, the plaintiff urged that Rule 56(e) does not require the non-moving party to rebut a summary judgment with affidavits or other materials unless the motion itself was accompanied by additional supporting materials. The court reiterated that the terms of the rule do not require the moving party to file affidavits or

additional materials in all cases:

> In cases like the instant one, where the non-moving party will bear burden of proof at trial on a dispositive issue, a summary judgment may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be made and supported as provided in this rule, and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the deposition, answers to interrogatories, admissions on file, designating specific facts showing that there is a genuine issue for trial.

_Celotex_, 477 U.S. at 323, 106 S.Ct. 2553. It is clear that _Celotex_ contemplated that the non-moving party would have the opportunity to go forward with the discovery. In the instant case, the parties are still attempting discovery and have not completed same. It should be noted that _Anderson_ and _Celotex_ were decided on the same day in 1986 by the Supreme Court, and taken together they stand for the well established rule that facts indicating a genuine issue for trial will defeat a motion for summary judgment, and that all justifiable inferences are to be drawn in favor of the non-moving party.

Further, in _Benton Volvo Metairie v. Volvo Southwest, Inc._, 479 F.2d 135 (5th Circuit - 1973), the Fifth Circuit stated the well established rule that on a motion for summary judgment, the moving party carries the burden of proof and he must show that no genuine issue of material fact exists even though at trial his opponent had the burden of proving the facts alleged. 479 F.2d at 138. In the _Benton_ case, Benton did not file affidavits or respond to the motion for summary judgment by Volvo Southwest. The court felt that in certain cases the filing of counter-affidavits would be only a perfunctory task. In conclusion, the affidavits filed by the defendant are insufficient to support their motion because they are self-serving, conclusory, ambiguous, and are not subject to the rigors of cross-examination during trial. These affidavits are further controverted by plaintiffs pleadings.

## XIV.

## <u>CONCLUSION AND PRAYER</u>

For the reasons stated in this response and brief, Defendant has stated valid causes of action against the Plaintiff and there are genuine issues of fact which preclude Plaintiff being granted a summary judgment. Defendant was totally legal under the previous ordinance under the principle of time, place, manner. The new ordinance added a confused shade of trim and the definition thereto that is the center of the present argument.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that Plaintiff's Motion For Summary Judgment be denied, that Defendant recover from Plaintiff reasonable attorney's fees and all costs of court, and for such other and further relief to which he is justly entitled.

Respectfully submitted,

   /s/ John L. Gamboa
John L. Gamboa
State Bar No. 07606000
Acuff & Gamboa, LLP
2501 Parkview Drive, Suite 405
Fort Worth, Texas 76102
(817)885-8500
(817)885-8504 Fax
ATTORNEY FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, in accordance with the Federal Rules of Civil Procedure, a true and correct copy of the foregoing documents was served via the Court's ECF Filing System, Facsimile and/or US Mail, first class, postage prepaid, on the 1st day of May, 2012, on the following counsel of record:

Thomas R. (Dan) Cushing - dcushing@bmpllp.com

Roger L. McCleary - rmccleary@bmpllp.com

Sawnie A. McEntire - smcentire@bmpllp.com

Beirne Maynard & Parsons LLP

1700 Pacific Ave, Suite 4400

Dallas Texas 75201

Attorneys for Plaintiffs                    __/s/ John L. Gamboa_____